UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 14-22203-CIV-MORENO**

CITY OF MIAMI GARDENS,

        Plaintiff,

vs.

WELLS FARGO & CO. and WELLS FARGO
BANK, N.A.,

        Defendants.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

    Born out of the assassination of Dr. Martin Luther King, Jr. in 1968, the Fair Housing Act addressed the denial of housing opportunities on the basis of race, color, religion, or national origin. Half a century later, the City of Miami Gardens is invoking the law to remedy discriminatory lending by Defendant Wells Fargo. The City contends that discriminatory lending persists even amidst the changes in lending practices implemented since the Great Recession. The theory of its case is that discriminatory loans in Miami Gardens have defaulted at greater rates, causing foreclosures, and reducing property values in the City, which, in turn, impacts the City's property tax revenue. At the outset of this case, the Court identified the Fair Housing Act's applicable statute of limitations and the threshold issue: whether Wells Fargo issued any predatory loans or discriminatory loans during the limitations period in Miami Gardens that violated the Fair Housing Act. If the City can show a Fair Housing Act violation during the limitations period, the continuing violations doctrine allows it to recover for past violations.

    At summary judgment, the parties agree that despite the allegations in the Third

Amended Complaint, Wells Fargo did <u>not</u> issue any predatory loans to minorities in Miami Gardens during the limitations period. That leaves the question of whether there were any other discriminatory loans, i.e. did Wells Fargo make loans to minorities that were more expensive than loans to non-minorities during the limitations period. To make that showing, the City must satisfy the *prima facie* case for disparate impact or disparate treatment discrimination. Because there is insufficient record evidence to support a claim for disparate impact, the parties' summary judgment pleadings focus on whether the City can make a showing of disparate treatment discrimination.

For a *prima facie* showing of disparate treatment, the City of Miami Gardens must set forth evidence of loan comparators that are similarly situated. The loans identified by the City's expert, Dr. Ian Ayres, have different origination dates, different lender credits, and different promotional offerings, all factors affecting the loan price. Accordingly, the Court grants Wells Fargo's motion for summary judgment because the City cannot make a *prima facie* showing of disparate treatment during the limitations period. Even if the City could make the necessary showing, Wells Fargo has sufficiently established legitimate nondiscriminatory reasons for the difference in the loan pricing. Finally, the record evidence is insufficient to establish Wells Fargo's reasons are pretextual.

THIS CAUSE came before the Court upon Defendant's Motion for Summary Judgment **(D.E. 162)**, filed on **May 31, 2018.**

THE COURT has considered the motion, the response, the supplemental briefing, the pertinent portions of the record, and being otherwise fully advised in the premises, it is

**ADJUDGED** that the motion is GRANTED.

# I.   **Background**

*A. Procedural History of this Case and Past Rulings*

Plaintiff, the City of Miami Gardens, is suing Wells Fargo for intentional lending discrimination and disparate impact discrimination in violation of the Fair Housing Act. The crux of the claim is that the loans made to white borrowers in Miami Gardens were less expensive than loans made to African-American and Hispanic borrowers. Miami Gardens argues that because the loans to minority borrowers were more expensive, they resulted in defaults, and foreclosures, which in turn lowered property values and decreased the City's tax revenue.

The Court issued an order requiring an amended complaint in this case on October 1, 2014. In that Order, the Court dismissed the 57-page complaint and required the City of Miami Gardens to specify exact violations of the Fair Housing Act in Miami Gardens. "The Complaint should state what specific predatory practices occurred in Miami Gardens and how minorities were allegedly targeted there. . .. The second amended complaint must be precise in detailing (1) how Miami Gardens is injured, (2) how that injury is traceable to the conduct of each Wells Fargo defendant, and (3) how the injury can be redressed with a favorable decision in this case." The case was subsequently stayed pending resolution of *City of Miami v. Bank of America Corp.*, 800 F.3d 1262 (11th Cir. 2015), which addressed whether a city had standing to sue under the Fair Housing Act. Following the Eleventh Circuit's decision, the Court reopened this case.

Next, this Court bifurcated discovery, allowing limited discovery on the narrow issue of whether there were loans during the two-year statute of limitations, June 13, 2012 to June 12, 2014, that violated the Fair Housing Act. This is a threshold issue in the case because under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) there could no continuing violation if there was none during the limitations period. At the conclusion of the limited discovery, Wells

Fargo moved for summary judgment arguing that none of the 153 loans originated between June 13, 2012 and June 12, 2014, violated the Fair Housing Act. That is the motion at issue now before this Court.

While the motion for summary judgment was pending, this Court again stayed this case when the Supreme Court granted certiorari on the *City of Miami* case. The Supreme Court addressed the issue of standing in this context and held cities are "aggrieved persons" with standing to sue for damages under the Fair Housing Act. *Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296, 1302 (2017). The Supreme Court added that to recover damages the city must do more than show that its injuries foreseeably flowed from the alleged statutory violation. *Id.* Consistent with the Supreme Court's direction, the Court of Appeals is now deciding the "contours of proximate cause under the Fair Housing Act and how it applies in these cases." This case remained stayed during the pendency of the Supreme Court decision given the dispositive nature of the standing issue, but this Court reopened this case once the Supreme Court found standing. Wells Fargo's position in this case is that the Eleventh Circuit's decision regarding proximate cause does not affect this case, where its motion for summary judgment is pending. The Court agrees with Wells Fargo as the procedural trajectory of this case differs from the *City of Miami* case as the question before the Court is whether the record evidence establishes a violation of the Fair Housing Act during the Limitations Period. At this juncture, the Court does not need to decide the pleading requirements of proximate cause in the context of a Fair Housing Act complaint.[1]

---

[1] In ruling on summary judgment, the Court is mindful of the Supreme Court's statement: "In the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires. The housing market is interconnected with economic and social life. A violation of the FHA may, therefore, 'be expected to cause ripples of harm to flow' far beyond the defendant's misconduct. Nothing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel. And entertaining suits to recover damages for any foreseeable result of an FHA violation would risk 'massive and complex damages litigation.'" *City of Miami*, 137 S. Ct. at 1306 (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 534 (1983)).

Currently pending before the Court are Wells Fargo's Motion for Summary Judgment and supplemental briefs filed by both sides. The summary judgment motion argues that Miami Gardens lacks evidence of discriminatory loans and evidence of foreclosures attributable to those loans, during the statute of limitations period, June 13, 2012 to June 12, 2014.

## B. Factual Background

The record shows a total of 153 loans secured by properties in Miami Gardens during the limitations period, including 130 loans to minority borrowers and 8 loans to non-Hispanic white borrowers. They were divided between conventional loans and government loans, stemming from the Federal Housing Administration program. The loans at issue in this motion for summary judgment are all government FHA purchase loans.

The City's Third Amended Complaint states that Wells Fargo "steered" minorities into certain types of predatory loans when the borrowers qualified for better terms. The Third Amended Complaint lists 12 types of loans, including high-cost loans, subprime loans, interest-only loans, balloon payment loans, loans with prepayment penalties, negative amortization loans, no documentation loans, higher cost government loans (including FHA and VA loans), home equity lines of credit, and adjustable rate mortgages with teaser rates where the lifetime maximum rate is greater than the initial rate plus 6%. The record shows that of the 153 loans made during the limitations period, the only loans at issue are the government refinance loans under the FHA program, and loans that have to be reported under the Home Mortgage Disclosure Act, known as rate-spread reportable loans. [2]

To support its claims, the City provided the testimony of its City Manager, Cameron Benson, as a Rule 30(b)(6) representative. Benson did not identify any discriminatory, or

---

[2] At oral argument before Magistrate Judge O'Sullivan, the Plaintiff's counsel conceded that none of the loans at issue are inherently predatory. (D.E. 166, Hr'g Tr. at 70).

predatory loans. He also could not identify borrowers in Miami Gardens, who received more expensive loans when they qualified for better financing.[3] Benson also could not identify any minority borrowers, who received Wells Fargo loans that were made on different terms than loans to white borrowers. Benson also had no information to support the allegations in paragraph 76 of the Third Amended Complaint, which identifies four addresses corresponding to predatory loans in Miami Gardens. In answering interrogatories regarding predatory loans, the City listed the four addresses identified in paragraph 76 of the Third Amended Complaint.

In addition, the City did not provide evidence that any residents complained about these types of loans in Miami Gardens. Community Development Director, Laurin Yoder, and City Manager Benson were not aware of any complaints made to the City by any borrowers about any of the 153 loans made during the limitations period.

### 1. Loans at Issue

In the initial summary judgment briefing, the City pointed to four loans issued in Miami Gardens during the limitations period that violated the Fair Housing Act. After oral argument and in the supplementary briefing, the City focuses on two loans that it claims violated the Fair Housing Act during the limitations period.

The City's expert, Dr. Ian Ayres, presents two matched pairs of loans that he claims are suitable for comparison. The first matched pair is loan HC6 and loan NHW8. HC6 is an FHA purchase loan made to an African-American borrower. The FICO score for this borrower is 741, the borrower's loan-to-value ratio is 98%, and the borrower's debt-to-income ratio is 43%. Loan NHW8 is also an FHA purchase loan to a white borrower. That borrower on loan NHW8 has a lower FICO score of 702, the same loan-to-value ratio (98%), and the borrower's debt-to-income ratio is 41%. The actual APR for HC6 is 5.9978% resulting in a rate spread of 1.58%, and the

---

[3] Wells Fargo argues this lack of knowledge is detrimental to the City's case.

actual APR for NHW8 is 5.3181% resulting in a rate spread of 1.12%. The City's position is that the minority borrower received a rate-spread reportable high-cost loan (HC6) whereas a non-Hispanic white borrower received a lower cost loan (NHW8).

Dr. Ayres identifies a second matched pair, HC2 (minority loan) and NHW8 (non-minority loan). HC2 is an FHA purchase loan made to a Hispanic borrower, whose FICO score is 712, the loan-to-value ratio is 98%, and borrower's debt-to-income ratio is 41%. Dr. Ayres indicates that HC2 has a rate spread of 2.03%, and NHW8 has a rate spread of 1.12%. The City's position is that HC2 is a higher cost loan than NHW8. HC2 experienced delinquencies, while NHW8 did not. Although HC2 suffered delinquencies, it did not result in foreclosure.

Wells Fargo's expert, Dr. Bernard Siskin, contends there are two reasons why loans HC6 and HC2 are not similarly situated to loan NHW8 and should not be deemed matched pairs. Namely, HC2 and HC6 received lender credits to defray closing costs at the outset of the loan in exchange for a higher interest rate. In addition, the borrower on loan NHW8 received a promotional 50 basis point pricing discount that Wells Fargo offered to all loans, government and conventional, originated during October 21, 2013 and November 4, 2013, in the Miami or Fort Lauderdale Metropolitan Divisions. That promotion was not available when loans HC2 and HC6 originated. Dr. Siskin also differentiates the loans because the federal government increased FHA annual mortgage insurance premiums due to a higher incidence of rate-spread reportable lending. For example, HC2 originated in November 2012 and NHW8 originated in December 2013 after the government increased the cost of mortgage insurance premiums earlier during 2013. This is another factor that influenced pricing. Dr. Ayres suggests that this is a reason why loan NHW8 should have been more expensive than HC2 because of the increased insurance requirement.

Dr. Siskin explains that in both matched pairs of loans, the minority borrowers chose to receive a higher rate of interest in exchange for a lender credit to pay for expenses associated with closing the loan. Lender credits occur when a borrower elects to have a higher interest rate, and the bank gives the borrower a credit for the fees necessary to pay what they would otherwise have to pay out-of-pocket at closing. For loan HC2, the minority borrower received $8,000 in lender credits and for HC6, the minority borrower elected to receive $1,878 in lender credits, whereas the non-minority borrower for loan NHW8 received $479 in lender credits to cover closing costs. The City's position at summary judgment is that Wells Fargo has not met its burden to show how the lender credits numerically affect the APR (annual percentage rate).

Dr. Ayres recalculated the hypothetical APR's that loan HC2 and NHW8 would have received if HC2 did not receive the lender credits in the amount of $8,000, and NHW8 did not receive the promotional pricing. Under his hypothetical scenario, the APR for loan HC2 would be 5.4118% with a corresponding rate spread of 1.86% and for NHW8, the APR would be 5.4448% with a rate spread of 1.25%. In his view, HC2 remains a rate spread reportable discriminatory loan issued to a minority borrower, whereas NHW8 is not rate spread reportable. Dr. Ayres performs a similar analysis on loan HC6 and NHW8. Dr. Ayres conducts a similar analysis regarding loan HC6 and what the hypothetical APR and rate spread would be without the lender credits and without the promotional pricing. He concludes that loan HC6 would have an APR of 5.9560% with a corresponding rate spread of 1.54%, while loan NHW8 would have an APR of 5.4448% with a corresponding rate spread of 1.25%.

Dr. Siskin rebuts this analysis by stating that "[w]hen differences are accounted for (i.e., if the minority borrowers receiving HC2 and HC6 had not chosen lender credits and the non-Hispanic white borrower's loan (NHW8) had been originated when the promotion was not in

effect), we see a very different picture. Neither of the loans to the minority borrowers (HC2 and HC6) are rate-spread reportable, and one of the minority loans is slightly less expensive by .09 percentage points (HC2) than the non-Hispanic white loan (NHW8) and one is slightly more expensive by .19 percentage points (HC6) than the non-Hispanic white loan (NHW8). . . These results do not support a conclusion that the lower rate spread for NHW8 as compared to HC6 is due to race (adversely), any more than we could conclude that the lower rate spread for HC2 is due to race (favorably)."

## II.     Legal Standard

Summary judgment is authorized where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings; the non-moving party must establish the essential elements of its case on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). The non-movant must present more than a scintilla of evidence in support of the non-movant's position. A jury must be able reasonably to find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

## III.     Legal Analysis

The Court has defined the Fair Housing Act's limitation period as June 12, 2012 through June 12, 2014. To survive summary judgment, the record evidence must show a violation of the Fair Housing Act during the limitations period. The parties disagree about what actions constitute a violation. The City's position is that it can prove a violation by merely showing

differential pricing in a loan to a minority borrower versus a white borrower. Wells Fargo adds that to prove a violation of the Fair Housing Act, the City must make a prima facie showing of disparate impact discrimination or disparate treatment (i.e., intentional discrimination).

In *City of Los Angeles v. Wells Fargo & Co.*, No. 13-CV-09007, 2015 WL 4398858 (C.D. Ca. July 17, 2015), *aff'd City of Los Angeles v. Wells Fargo & Co.*, 691 F. App'x 453 (9th Cir. 2017), the district court analyzed whether the city could establish a prima facie case for disparate impact liability to determine whether any violation occurred during the limitations period. This Court, likewise, will examine whether the City can establish a prima facie case of disparate impact or intentional discrimination to determine if there is a violation of the Fair Housing Act. It is not simply enough to show that one loan is more expensive than another, rather there has to be a violation of the Fair Housing Act.

The purpose of the Fair Housing Act is to "provide within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Section 3605(5) of the Act provides:

> It shall be unlawful for any person or other entity whose business includes engaging in real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex handicap, familial status, or national origin.

42 U.S.C. § 3605(a); *see also* 42 U.S.C. § 3604(b) (prohibiting discrimination in the "sale or rental of a dwelling."). A plaintiff can bring a claim under the Act under two different theories: disparate treatment or disparate impact. In a disparate treatment case, the plaintiff must establish "that the defendant had a discriminatory intent or motive," while in a disparate impact case, the plaintiff challenges a practice or policy that has a "disproportionately adverse effect on minorities, and are otherwise unjustified by a legitimate rationale." *Texas Dep't of Housing &*

*Comm. Affairs v. Inclusive Communities Project*, 135 S. Ct. 2507, 2513 (2015) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)).

The core issue for this phase of the litigation is whether Wells Fargo violated the Fair Housing Act during the limitations period. 42 U.S.C. § 3613(a)(1)(A) (stating that any claim under the Act must be brought within two years of "the occurrence or the termination of an alleged discriminatory housing practice. . ..").  If that occurred, then the continuing violations doctrine allows the City to sue for conduct that occurred outside the limitations period. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380-81 (1982) ("where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice.").  A "pattern-or-practice theory of liability may revive acts outside the statutory period if those acts are part of a 'continuing violation.'" *City of Los Angeles*, 2015 WL 4398858, at *4 (quoting *Havens*, 455 U.S. at 380-81).

*A. The effect of the City's 30(b)(6) representative's testimony*

The City Manager, the City's designated 30(b)(6) corporate representative, conceded during his deposition that the City could not identify any "predatory" or "discriminatory" loans in the limitations period.  The City's designee was unaware of any information providing a basis for the City's allegation that borrowers were or may have been eligible for "more favorable and less expensive loans."  Because the City, through its corporate representative, failed to identify any loans made in the limitations period that violated the Fair Housing Act, Wells Fargo argues this case is time-barred.

The dual requirements of Rule 30(b)(6) are that the corporate designee (1) must "testify about facts within the corporation's collective knowledge" and (2) "must also testify about the corporation's position, beliefs and opinions," including its interpretations of documents and

events. *QBE Ins., Corp. v. Jorda Enters., Inc.*, 277 F.R.D. 676, 689 (S.D. Fla. 2012) (citing *Great Am. Ins. Co. v. Vegas Constr. Co., Inc.*, 251 F.R.D. 534, 539 (D. Nev. 2008)). "[T]he corporation has a duty to make a good faith, conscientious effort to designate appropriate persons and to prepare them to testify fully and non-evasively. . .. In other words, a corporation is expected to *create* an appropriate witness or witnesses from information reasonably available to it if necessary." *Id.* at 689 (quoting *Great Am.*, 251 F.R.D. at 540). As a corollary, a corporation "must perform a reasonable inquiry for information that is reasonably available to it." *Id.*

The City argues this case is procedurally different from *QBE* because the 30(b)(6) representative was deposed months before the expert disclosure cutoff. Plaintiff argues the interrogatory responses provided evidence of discrimination, even though the 30(b)(6) representative from the City had no knowledge of discriminatory lending. Although the City is correct that the expert discovery was not imminent when the Rule 30(b)(6) deponent testified, the City had an obligation to prepare the City Manager to testify and advise Defendant of the basis for the lawsuit under the rule. Moreover, the City's reliance on conclusory interrogatory responses does not create sufficient evidence to negate the testimony of the City's 30(b)(6) representative, who indicated the City had no basis for its claims against Wells Fargo. *Id.* at 689 ("[A] corporation cannot point to interrogatory answers in lieu of producing a live, in-person corporate representative designee.").

Therefore, the Court finds the City is bound by the testimony of its Rule 30(b)(6) representative. *Id.* at 690 ("[C]orporation which provides a 30(b)(6) designee who testifies that the corporation does not know the answers to questions 'will not be allowed to effectively change its answers by introducing evidence at trial.'") (quotations omitted); *Wausau Underwriters Ins. Co. v. Danfoss, LLC*, 310 F.R.D. 683, 687 (S.D. Fla. 2015) (holding that a

corporate representative's "'I don't know' answers" are "deemed fully binding," and corporation "may not proffer any testimonial evidence regarding [its] collective position on the notice topics contrary to or in addition to what [its Rule 30(b)(6) designee] answered on [its] behalf.").

### B. Disparate Impact

Even if the Court were to find the City Manager's testimony inconsequential, the City would need to establish a *prima facie* case of disparate impact or intentional discrimination (disparate treatment) to survive summary judgment. To establish a prima facie case for disparate impact liability under the Act, a plaintiff must prove the occurrence of certain outwardly neutral policies and a disproportionately adverse impact on persons of a particular class caused by the defendant's facially neutral practices. *City of Los Angeles*, 2015 WL 4398858 at *5.

Following *Inclusive Communities*, the Department of Housing and Urban Development codified a three-part burden-shifting test for disparate impact claims under the Act. *See* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460-01 (Feb. 15, 2013). First, the plaintiff "bears the burden of proving its prima facie case that a practice results in, or would predictably result in, a discriminatory effect on the basis of a protected characteristic." *Id.* at 11460. If the plaintiff can make a *prima facie* showing, the burden shifts to the defendant "to prove that the challenged practice is necessary to achieve one or more of its substantial, legitimate, nondiscriminatory interests." *Id.* "If the respondent or defendant satisfies this burden, then the charging party or plaintiff may still establish liability by proving that the substantial, legitimate, nondiscriminatory interest could be served by a practice that has a less discriminatory effect." *Id.*; *see also City of Miami v. Wells Fargo & Co.*, No. 13-24508-CIV-DIMITROULEAS, 2016 WL 1156882, at *4 (stating a plaintiff must "(1) show statistically-imbalanced lending patterns which adversely impact a minority group; (2) identify a facially-neutral policy used by Defendants; (3) allege that such policy was 'artificial, arbitrary,

and unnecessary;' and (4) provide factual allegations that meet the 'robust causality requirement' linking the challenged neutral policy to a specific adverse racial or ethnic disparity.") (quoting *Inclusive Communities*, 135 S. Ct. at 2522-24).

*Inclusive Communities* further instructs this Court to examine the Plaintiff's *prima facie* showing "with care" using "cautionary standards." *Inclusive Communities*, 135 S. Ct. at 2523-2524. The Supreme Court cautioned against imposing liability "based solely on a showing of statistical disparity." *Id.* at 2522. The Court explained that if a plaintiff relies on a statistical disparity, the claim "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Id.* at 2523. Additionally, a plaintiff must prove a "robust causality" between the policy and the statistical disparity to ensure "that [r]acial imbalance . . .does not, without more, establish a prima facie case of disparate impact," and that defendants are not found liable for racial disparities they did not create." *Id.* (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). The Supreme Court later added in *City of Miami*, 137 S. Ct. at 1306, that proximate cause under the Fair Housing Act requires "some direct relation between the injury asserted and the injurious conduct alleged." (quoting *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992)). "[F]oreseeability alone does not ensure the close connection that proximate cause requires." *Id.* at 1306.

### 1. Prima Facie Case

To state a claim for disparate impact, the City must identify a race neutral policy that when applied uniformly causes a disparate impact on minorities. The City identifies Wells Fargo's Product Validation Process as a policy that causes a disparate impact.[4] That process

---

[4] The Product Validation process requires Wells Fargo's finance department to review every FHA purchase loan to determine whether an equivalent and available conventional loan might be more financially beneficial to the borrower. In this case, however, the City does not claim that the borrowers who received FHA purchase loans should have received conventional loans.

examines borrowers to determine if they are eligible for less expensive loans. Another practice identified by the City is Wells Fargo's practice of allowing lender credits on certain FHA loans, which the City contends were a vehicle for differential pricing.

The City relies on the declaration of Alvaro Orozco to support its claim that race-neutral policies cause a disparate impact on minorities. Orozco is a former employee of Wells Fargo, who did not work within the City of Miami Gardens and who only worked at Wells Fargo for 46 days over two years before the limitations period began. The Court granted Wells Fargo's motion to strike the declaration of Alvaro Orozco for these reasons. Even if this Court found the testimony of Alvaro Orozco should remain on the record, his testimony clearly does not suffice to convince a reasonable jury. In any event, the City also falls short of meeting the other prongs of a *prima facie* case of disparate impact. There is no evidence of a statistical disparity, let alone evidence of the robust causation needed to show the policy caused the statistical disparity.

The evidence shows Wells Fargo issued 153 loans during the limitations period. Of the 153 loans, 130 of them were to minority borrowers and 8 loans were made to non-Hispanic white borrowers. There are only two loans that the City is alleging were at a higher cost to minorities. Two loans, even assuming they were more expensive, is insufficient record evidence to show the policies produced "statistically-imbalanced lending patterns." Accordingly, the Court finds the City fails to show a violation of the Fair Housing Act during the limitations period under a disparate impact theory.

### C. Intentional Discrimination or Disparate Treatment in the Credit Context

The City rests its claim of intentional discrimination (disparate treatment) on two "matched pairs," comparing two loans to minority borrowers with one loan to a white borrower. In his supplementary report, Dr. Ayres concludes that "Wells Fargo issued some loans to minority borrowers that were more expensive than loans made by Wells Fargo to non-Hispanic

white borrowers with similar characteristics during the limitations period." *Supplemental Ayres Report* at ¶ 24.

### 1. Prima Facie Case

The Eleventh Circuit in *Boykin v. Bank of Am. Corp.*, 162 F. App'x 837, 839 (11th Cir. 2005) established the standard for comparing minority and non-minority borrowers with "loan details" that are "nearly identical." *Boykin* followed the now-familiar framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) to evaluate the claim of discrimination under the Fair Housing Act. *See also Sec'y, U.S. Dep't of Hous. & Urban Dev. v. Blackwell*, 908 F.2d 864, 870 (11th Cir. 1990).

"[T]he elements of a prima facie case are flexible and should be tailored on a case-by-case basis, to differing factual circumstances." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1123 (11th Cir. 1993) (quotations omitted). In this credit discrimination context, the City can establish a *prima facie* case of discrimination by offering evidence showing: (1) that the borrower is a member of a protected class; (2) that the borrower applied for and was qualified for a loan from the defendant; (3) that the loan offered by the defendant was on more unfavorable terms than a loan to an applicant outside the borrower's protected class with similar qualifications.

To meet the comparability requirements of the *prima facie* case, the City must show that the borrower is "similarly situated in all relevant aspects to the non-minority" comparator. *Boykin*, 162 F. App'x at 839 (quoting *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001)). Comparators must be "nearly identical." *Id.* The Eleventh Circuit in *Boykin* emphasized that a "comparator's credit qualifications and loan details must be 'nearly identical' . . . in order to prevent this court from second guessing the bank's business decision and confusing apples with oranges." *Id.* (quoting *Cooley v. Sterling Bank*, 280 F. Supp. 2d 1331, 1340 (M.D. Ala. 2003), *aff'd*, No. 03-14727, 116 F. App'x. 242 (11th Cir. July 16, 2004)).

*a. Evidence of Comparators*

Defendant hinges its motion for summary judgment on the City's failure to show that the "matched pairs" are nearly identical. The City opposes summary judgment arguing it has shown evidence of the borrowers' financial background, which differentiates this case from *Boykin*. In this case, the City's expert, Dr. Ayres, matches two pairs of loans to make a *prima facie* case.

The first "matched pair" is loan HC6 and loan NHW8, which are both FHA purchase loans. HC6 is a loan to an African-American borrower, whose FICO score is 741, the loan-to-value ratio is 98%, and the debt-to-income ratio is 43%. The white borrower of loan NHW8 has a FICO score of 702, the same loan-to-value ratio of 98%, and a debt-to-income ratio of 41%. The rate spread on loan HC6 (1.58%) is higher than NHW8 (1.12%), which Dr. Ayres concludes makes HC6 a more expensive loan.

The other matched pair, HC2 and NHW8, are also both FHA purchase loans. The Hispanic borrower of HC2 had a FICO score of 712, as compared to NHW8's borrower, who had a FICO score of 702. Both had the same loan-to-value ratio of 98%. HC2's borrower had a debt-to-income ratio of 47%, while NHW8's borrower had a lower ratio of 41%. HC2 has a rate spread of 2.03%, where NHW8's rate spread is 1.12%. The City's position is that HC2 was a higher cost loan that suffered delinquencies.

Defendant's expert, Dr. Bernard Siskin, explains that HC6 and HC2 have a higher rate spread because those borrowers elected to receive lender credits to defray closing costs, in exchange for a higher APR. A second reason is that the borrower on NHW8 received a promotional 50 basis point pricing discount, which Wells Fargo gave to all loans originating during a particular two-week period. Wells Fargo Vice President, Jill Hunt, testifies that HC6's borrower received $1,878 in lender credits and HC2's borrower received $8,000 in lender

credits. Defendant's position is that the lender credits increased the APR's on HC6 and HC2, while the promotional discount and the lower lender credits reduced it on loan NHW8. In his supplemental report, Dr. Ayres states that even if the lender credits on these loans were the same, HC6 and HC2 would still be more expensive.[5]

It is undisputed that loan HC2, which obtained the highest amount of lender credits of $8,000, also had the highest rate spread of 2.03%. Loan HC6, which had $1,878 in lender credits had a lower rate spread of 1.58%. Loan NHW8, which had $479 in lender credits and was eligible for a promotional discount due to its origination date, had the lowest rate spread of 1.12%. This evidence shows that the loan with the highest lender credits had the highest rate spread, while the loan with the lowest lender credits and the promotional discount had the lowest rate spread.

### b. Does the evidence meet the comparability standard?

Unlike *Boykin* where the record was deficient to compare the credit qualifications of the borrowers, the Court agrees with the City that this record provides evidence of the similar characteristics of the borrowers on these loans, like credit scores, loan-to-value ratios, and debt-to-income ratios.[6] *Boykin*, however, also specifies that the "loan details must be nearly identical." *Boykin*, 162 F. App'x at 839-840. The Bureau of Consumer Financial Protection has explained that "comparisons between loans with and without lender credits *[are] misleading*" because "the prices of loans with such offsetting credits would appear artificially high." 80 Fed. Reg. 66128; 66213 (2015); Final Rule at 66,213. Recognizing the same concept, the Eleventh

---

[5] Both sides hypothesize what the rate spread would be without the lender credits and without the promotional pricing. While Dr. Ayres concludes that HC2 and HC6 would still be rate spread reportable, Dr. Siskin concludes they would not be.

[6] In so stating, the Court is not necessarily finding the borrowers have sufficiently similar characteristics to render them comparators. There are differences in credit scores, debt-to-income ratios, and, of course, timing, which are factors that all affect the pricing of a loan. Because the Court finds the loan terms are not nearly identical, the Court need not address whether the borrowers' credit qualifications are sufficiently similar.

Circuit has explained that comparators are not "'nearly identical'" if they had different "costs . . . of their loans." *Boykin*, 162 F. App'x at 840.

There is no factual dispute that the "loan details" between the minority and non-minority borrowers in these two circumstances are not "nearly identical." The minority borrowers opted to receive a higher rate of interest in exchange for lender credits ($1,878 and $8,000) to defray closing costs, while the non-minority borrower of loan NHW8 only received $479 as a credit to close, in addition to receiving a promotional discount.[7] The loans originated at different times, and the borrowers elected different structures to either finance closing costs over time or pay them at the outset. These variations are sufficient for the Court to find that the comparator loans are not nearly identical. The *Boykin* standard requires this Court to end the inquiry and find the comparisons the City offers cannot support a claim of discrimination. The Court will not consider Dr. Ayres's efforts to extrapolate what the APR would be on HC2 and HC6 without the lender credits. That is simply a term of the loan that this Court cannot ignore and renders these loans "apples and oranges" that cannot be compared by a jury. *Boykin*, 162 F. App'x at 839 (explaining that comparing nearly identical loans is necessary to "prevent this Court from second guessing the bank's business decision and confusing apples with oranges.").

Aside from the lack of suitable comparators, the City's argument that the Defendant failed to meet its summary judgment burden fails. The City makes much of Dr. Siskin's failure to connect the numerical relationship between a lender credit and the impact on APR. It is well-established that receiving money upfront at closing in the form of a lender credit equates with an increased interest rate. In fact, the Department of Housing and Urban Development describes options that "permit a borrower to pay a slightly higher interest rate in exchange for the lender

---

[7] The record also suggests that the mortgage insurance premiums on these loans were at different rates, which is another factor that differentiates the loans.

paying the borrower's closing costs" as having "been very successful and are acceptable to HUD." Dep't of Hous. & Urban Dev., Mortgagee Letter 94-7 (Feb. 2, 1994).[8]  Even if Dr. Siskin's testimony failed to make the numerical connection, this Court cannot find that the City is able to make its *prima facie* case by showing that the "matched pairs" are "nearly identical" as required by *Boykin*.

Even if the City could make a *prima facie* case of discrimination, the burden then shifts to Wells Fargo to show legitimate nondiscriminatory reasons motivated the different pricing. Wells Fargo has offered the loan origination dates, the lender credits, and promotional pricing on loan NHW8 as legitimate nondiscriminatory reasons that motivated the different pricing.  Once the Defendant proffers legitimate nondiscriminatory reasons, *Boykin* then places on the City "the ultimate burden of establishing by a preponderance of the evidence that a discriminatory intent motivated the [lender's] action." *Id.* (quoting *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983)).

Dr. Ayres does not conclude that his analysis shows discrimination, nor does he state the differences are caused by the borrowers' race.  Rather, he concludes that "Wells Fargo issued some loans to minority borrowers that were more expensive than loans made by Wells Fargo to non-Hispanic white borrowers with similar characteristics during the limitations period."  The law, however, requires the City to have evidence that the differential pricing is caused by race, and not by the reasons proffered – lender credits, promotional pricing, and timing.  In addition, Dr. Ayres admits his assignment was limited to determine only whether Wells Fargo "had issued any loans to minority borrowers that were more expensive than loans made by Wells Fargo to non-Hispanic white borrowers with similar characteristics." *Supplemental Ayres Report* at ¶23. Dr. Ayres does not dispute that his method of comparison also reveals situations in which Wells

---

[8] The letter can be found at https://www.hud.gov/sites/documents/DOC_36143.TXT

Fargo originated loans to minority borrowers that were less expensive than loans issued to white borrowers. He states: "The fact that Wells Fargo may have also issued some loans to minority borrowers that were priced lower than loans made to non-Hispanic white borrowers with similar characteristics does not contradict my findings." *Id.* His method shows that in certain instances both minorities and non-minorities might have advantageous or disadvantageous pricing. The racial differences here can point in both directions, and therefore it cannot be said that the difference is caused by race. Accordingly, the Court grants the motion for summary judgment finding even if the City could state a *prima facie* case by providing "nearly identical" comparators, the City ultimately cannot carry its burden to show by a preponderance of the evidence that Wells Fargo's reasons for the price differentials were mere pretext for discrimination.

Because the Court finds the City has failed to make a *prima facie* case for a Fair Housing Act violation in the limitations period, the Court need not decide whether the City's failure to show an injury in the limitations period requires summary judgment.

DONE AND ORDERED in Chambers at Miami, Florida, this ____ of June 2018.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record